Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this Honorable Court. Good morning. The case for today is 2020-20147 United States v. Wilmar Rene Duran-Gomez. You may proceed, Mr. Smith. We can see you now all of a sudden. Good morning, Your Honor, and may it please the Court, Jason Smith for the United States. The District Court erred by dismissing this case on speedy trial grounds. The Speedy Trial Clause of the Constitution protects a defendant's interest in a prompt trial. And in the nine years before this case was dismissed, Duran-Gomez never asserted his right to a prompt trial. He never sought a prompt trial by asking to have one scheduled. He never objected to another party's continuance. Instead of asserting that right, during that nine-year period, Mr. Duran-Gomez requested six continuances, which wound up delaying his trial by four years and more than four months. He agreed to seven of his co-defendants' continuances, which continued trial for another two years and two months. And he submitted joint scheduling orders, which delayed the trial almost another four years. In light of those facts, the second and third Barker factors weigh overwhelmingly against Duran-Gomez's speedy trial claim. Do I understand correctly that even at the end, Mr. Duran-Gomez was seeking a 2022 trial, and you guys preferred a 2021 trial? That's correct, Your Honor. The parties had met. Mr. Duran-Gomez had asked for essentially another two-year extension of the trial. While the government was only willing to go one year, the parties compromised on that, and that's how we wound up with a March 8, 2021 trial date in the last joint pretrial order. The second and third Barker factors weigh overwhelmingly against Mr. Duran-Gomez, and he hasn't made the strong showing that he would have to make, on the fourth factor, on prejudice, to obtain a pretrial dismissal. Counsel, we need to break this down into the pre-indictment and the post-indictment, right? There's some conflation in the order, but we, for our analysis, must break it down, don't we? You do, Your Honor. And the district court relied heavily, referred heavily, into the pre-indictment period. But Duran-Gomez isn't entitled to dismissal for the pre-indictment period because he hasn't moved on the basis of the Fifth Amendment due process clause, which the Supreme Court has said is the governing authority for pre-indictment delay. The Speedy Trial Act is inapplicable, correct? Correct, to the pre-indictment period. And there must be some sort of bad faith, correct? Correct. Under the due process clause, correct? Correct. To obtain dismissal based on pre-indictment delay, under this court's opinion in Gulley, the defendant has to show both that the government delayed indicting in bad faith and actual substantial prejudice. The district court seems to have relied substantially on a viewpoint that there were some sort of immigration charges and that these were also some sort of capital charges or something in 2006. That's not, there's no basis in the records for that, is there? Correct, Your Honor. There is no basis. The district court clearly erred, as we explain in our brief, in finding that Duran-Gomez was criminally arrested in 2006. Do you understand there to be any other basis for the alleged bad faith in the pre-indictment period in the district court's order? I think that one of the bases is the idea that Duran-Gomez was arrested and held without charges or was arrested on criminal charges not brought before the proper judicial officer. But we just talked about that, that that's an error. Correct, Your Honor. It was criminal administrative proceedings to be removed because he had crimes of moral turpitude, multiple crimes. Correct, Your Honor. The other basis that the district court relied on was a finding that Duran-Gomez had pled guilty to a cooperation agreement in the obstruction case and that the government had improperly used his cooperation against him. That's incorrect too because there is no cooperation agreement. Correct. Is there any other basis in the pre-indictment part that you want to talk about? I'm just trying to move methodically through this. Is there anything else in the pre-indictment period that you want to talk about? No, Your Honor. Okay. Oh, Judge Sparks still has a question. I have a question on the pre-indictment. The charges initially were immigration charges. The government refers to the arrest in November of 2006 as, quote, an administrative arrest, close quote. And I understand ICE had custody until 11 December 2006 following the 4 December 2006 guilty plea to obstruction by a defendant. What, if anything, ever happened to the immigration charges for which he was arrested? The civil immigration proceeding, number one, there isn't a lot of detail about that in the record because it didn't proceed in light of Duran-Gomez being criminally prosecuted. My understanding is that that civil immigration proceeding sat awaiting further action. And, for instance, when the district court dismissed this case, a detainer from the immigration proceeding remained pending. And so if this court hadn't stayed to dismiss and release order, what would have happened was Duran-Gomez would have gone back to immigration custody for those civil immigration proceedings to continue. So he would be picked up and removed because he's completed his other sentence. Is that correct? He would have been picked up and gone through the process, yes, if he was just free in the world. But there's not really much of a process for someone with too criminal a moral turpitude. You don't get a right to not be removed. I think that's right, Judge. I just hesitate to wade into the immigration law side because it's not my strong suit. And he was not picked up on immigration charges. The opinion says that, but there were no immigration charges. We think about immigration charges like illegal reentry, smuggling aliens. These might be related, but that's not what he was picked up on. He was picked up only for being administratively because he wasn't supposed to be in the country, correct? Correct. That is correct, Your Honor. There were no immigration charges per se. Right. He was not criminally charged with immigration violations in November of 2006. But it was an administrative arrest according to the government. Correct, Your Honor. He was then taken before a senior supervisory immigration official who determined that he was, in fact, in the country illegally and determined that he should be held without bail because it was mandatory under those circumstances pending the outcome of the immigration proceedings. And again, he was held by ICE until he was transferred after he pleaded guilty to obstruction of justice. December of 2006. It wasn't until he pleaded guilty, Your Honor. It was until he was charged with obstruction of justice. Right. I understand. He pleaded guilty in the 6th, and then he was indicted subsequently, 12-11. That's when the transfer took place, as I understand it, 11 December of 2006. The complaint happens on December 4th of 2006, I believe, Your Honor. I think that same day he is transferred to criminal custody. He's arrested on that complaint and then held criminally for the obstruction offense he committed while he was in immigration custody. And he remains in criminal custody. The obstruction indictment returns December 27th of 2006, and he pleads guilty in May of 2007 in the obstruction case. Now, I know we want to go pre-indictment, post-indictment, but this overlaps. What was the reason for all the continuances of sentencing on the obstruction charge that overlapped until he was finally sentenced on the obstruction charge after the first indictment? The record is thin on that, Your Honor. There is not a ton of explanation. What I can tell you is the first 10 months of continuances after the guilty plea in the obstruction case, the first seven months of that come from requests by the probation department looking to extend the time to prepare the PSR. The next three months of that time come from requests from Duran Gomez's defense attorney looking to extend his time to file objections to the PSR. And that's after the PSR comes out detailing Duran Gomez's participation in and responsibility for, among other things, these murders. After that point, after that first 10 months, is when motions filed by the government start to extend the time. The first of those motions is an unopposed motion. All of the following motions are joint motions. All right. Or Judge Miller, not Judge Blake. Correct, Your Honor. All right. There isn't a lot of explanation in those motions, and I don't know what the reason is for that. I do know that there was ongoing investigation during that time. And I know that after those motions are done, the remaining time before Duran Gomez's sentencing is accounted for either by Duran Gomez's counsel seeking further continuances of sentencing, sometimes to prepare more, and also because of scheduling conflicts. And then there also seemed to have been some sui sponte changes in the schedule by Judge Miller for his own scheduling. So Mr. Duran Gomez agreed, though, to some of the – some of them he saw himself, and others he agreed to. Correct, Your Honor. He – all of the motions filed by the government except for one were joint motions, joint motions with Duran Gomez. He did, in fact, seek continuances on his own, and then the one motion that wasn't a joint motion with the government – with Mr. Duran Gomez from the government was an unopposed motion. And there was no – we're not dealing at all with any issue that somehow that case was delayed, didn't have a speedy trial, or didn't have – we're not dealing with anything regarding the resolution of that case. And no proceedings were brought in that case saying it was taking too long. Correct, Your Honor. No appeal. There was – at one point, I believe, Mr. Duran Gomez submitted a pro se letter asking to speed up his sentencing, complaining that his sentencing had been delayed too long. But that was a pro se filing just in the district court. Did you want to go to the post-indictment, if Judge Barksdale's questions have been answered? Yes. If the court doesn't have any further questions about the pre-indictment period, that period for the speedy trial analysis, as the Supreme Court has held in Wasco, just isn't relevant. The pre-indictment period is governed by the due process clause. So turning to the post-indictment period, the speedy trial claim, under the three Barker factors, Mr. Duran Gomez has never asserted his right to a speedy trial. The Supreme Court has talked about the importance of that factor and how where a defendant hasn't asserted their right to a speedy trial by asking for a prompt trial or opposing another party's continuance, it would really take extraordinary circumstances to find a violation of the defendant's right to a speedy trial. And those extraordinary circumstances just aren't present here. As we laid out in our brief, throughout this case, there have been multiple opportunities where the district court has specifically referred to the fact that this case has been going on a long time, doesn't want to have speedy trial problems. And on none of those occasions did Duran Gomez or his counsel speak up and indicate in any way that he was interested in a prompt trial. Well, with the exception of that status conference, and I forget the date where the judge said, he said, I'm going to be filing some motions and the judge made some questions, including, I'm just paraphrasing now, including a prompt trial or something like that. And he said, yes, but he never filed anything. Is that correct? Correct, if I can just take the opportunity to nitpick your paraphrasing. What happens is Duran Gomez's counsel says, and I'm going to paraphrase myself so I'll be open to nitpicking on this end. Duran Gomez says that they intend to file some motion and the district court says, is one of those motions going to be regarding whether you can get a fair trial after the time that has passed? And Duran Gomez's counsel says, essentially, yes. That conversation happened in 2012. That motion is never filed. Even if a motion had been filed, and it's tough to know exactly what kind of motion that would have been. Presumably it would have been a motion to dismiss, claiming that Duran Gomez couldn't get a fair trial. This court has specifically said a motion to dismiss is not an assertion of the speedy trial right. So agreeing with the court that you might file a motion similar to a motion to dismiss surely isn't an assertion of a speedy trial right. There have been innumerable opportunities if Mr. Duran Gomez actually wanted a prompt trial for him to have either requested a prompt trial, opposed another party's continuance, or sought a severance. The district court has explicitly invited Mr. Duran Gomez on numerous occasions to sever his trial from Rodriguez-Mendoza's trial at the point fairly late in these proceedings after the request from Rodriguez-Mendoza to withdraw the seek, to withdraw the notice of intent on him so that he could plead guilty to a cooperation agreement. After that plea agreement is rejected by the Attorney General, the district court turned to Duran Gomez's counsel and said, are we at the point now where we can sever this and try your case? And Mr. Duran Gomez responded that he needed more time. The record abundantly shows that he has never been interested in a prompt trial. And that is fatal to his claim. Counsel, can you talk about the delay with getting the death, you know, certified from the Attorney General's point of view and why that took, and there was a several month lap? I can, Your Honor. Just, if I can back up to give an overview of that process, which I realize I didn't do in my brief, so I apologize for that. It's a very deliberate process, obviously, because the death penalty is a very serious thing. And before the Attorney General, who makes the final decision about whether to seek or not seek in all capital cases, you want to give an opportunity for things to be fully investigated, fully vetted, and to allow defense counsel to participate at every stage. And it's essentially a three-stage process. First, the U.S. Attorney's Office that's doing the prosecution comes up with its recommendation. That recommendation goes to a committee, a DOJ committee in Washington, D.C. That committee then looks at all the facts and circumstances and makes a recommendation to the Attorney General, who makes the final decision in all capital cases about whether the government is going to seek the death penalty. At each of those first two stages, defense counsel has the opportunity to participate, to first do thorough investigation, to come up with any mitigating factors that they think exist to persuade the government not to seek the death penalty. That's one of the reasons why we do, and I did not do on this case, but in cases where you do budgeting, you have to know if they're actually serious about death or not. Because if they are, then you have to hire all these, approve all these mitigation experts and all these other people early on in the process for them to go and give their two cents worth, or their not two cents worth, but their very able assistance on these issues. That's why you want to make sure that you're actually serious about it so you don't have to hire two or three extra experts on this early on in the case when you're doing budgeting in cases. But that's not my question. My question was, there was a big lull after this was done in this case. And in fact, there was some part that something says there was some kind of mix up or mess up in the attorney general's, in that process, and that's in the brief of the other side. So can you tell us about that? I think what the court's referring to is the SEQ process with respect to the co-defendant, Mr. Rodriguez-Mendoza, not with respect to Mr. Duran-Gomez. The one multi-month delay that I know of in the Duran-Gomez SEQ process is on the front end. After the charges initially come down in July of 2010, there's a five-month delay up until December of 2010 before Mr. Duran-Gomez submits his initial budget request to the court for those kinds of experts that you were describing, Judge. So that's the one multi-month delay, and I'm doing quotes with my fingers here, that I know of in the Duran-Gomez process. With respect to Rodriguez-Mendoza, the main thing that I know of that caused the long length of time there with respect to ultimately coming out with the SEQ decision is that Mr. Rodriguez-Mendoza claimed to have an intellectual disability that precluded imposing the death penalty on him. When he first presented that claim to the U.S. Attorney's Office, the U.S. Attorney's Office requested, thought it would be appropriate to get adaptive function testing to confirm that claim of intellectual disability. Mr. Rodriguez-Mendoza's counsel was reluctant to undertake that additional testing. They thought that they had enough with just their expert report as it existed. And ultimately, after some back and forth on that, the U.S. Attorney at that first stage in the process made its recommendation, the office made its recommendation to the DOJ committee without getting that adaptive function testing. Then when Rodriguez-Mendoza gets up to that next stage in the process, the committee says what is kind of predictable at this point, we really need that adaptive functioning testing to be able to assess your claim of intellectual disability. And there has been extra time for that to happen now later in the process. That entails Mr. Rodriguez-Mendoza getting additional funding, entails the additional testing happening, the report of those results to the government, and then the government's opportunity to investigate those results from the extra testing with its own experts. So the intellectual disability claim really is responsible for a lot of the time involved in Rodriguez-Mendoza's Seek decision. One point I want to make about that, though, is that's Rodriguez-Mendoza's Seek decision. And throughout this time, Mr. Duran-Gomez chooses to wait out the result of that decision instead of going to trial. And he does that for strategic reasons that make a lot of sense. He thinks that it will be to his strategic advantage to know the answer to that question, to know whether Rodriguez-Mendoza is facing the death penalty. But that's a choice. That is one of the strategic choices that in the first instance fits in the defendant's hand. The defendant can choose, you know, in any case, is it more to my benefit to rush to trial or is it more to my benefit to wait and marshal particular evidence? And here, Duran-Gomez chose that second path. He thought it was more in his interest to wait and gather that information. But what the speedy trial clause doesn't let you do is come back and say, you know what, I changed my mind. I really wish I had gotten the speedy trial. And it also doesn't let… I have a few questions. Your time is running out about the discovery. Now, Frey makes it difficult to have a Kelly case on discovery because that's to the benefit to give the discovery, you know, for the defendant. But did the government have this open file process? Were all of the documents that were based stamped, were they always available in the office, the U.S. Attorney's office? Yes, Your Honor. What… They're not new documents that were hidden or anything like that? They are not. What the record reflects is that when a new prosecutor came on the case, frankly, the record keeping was not what it should have been. So knowing precisely which things had been hand-delivered and which things had just been made available was tough. And so she made copies of everything that was in the office, everything that had previously been available for counsel to come review and provided those documents to the defense. It was a service, a number and label and send everything over. Correct, Your Honor. There may have been, because it was what was referred to as an open file policy, and because investigation keeps going throughout all cases, frankly, all the way up through trial, new things get generated. So there would have been things that were getting added to those materials available for review. There might have been later reports. I know there were some later… I'm sorry, Your Honor? There weren't requests to come over and look at the documents once a month or something and say, I just want to double-check the file every so often? No, Your Honor. The record doesn't reflect any requests like that. Mr. Smith, before your time runs out, you began early in your argument pointing out that a specific due process claim isn't made for the pre-indictment period. Perhaps that's because their position is we don't have a pre-indictment, post-indictment. This starts with the arrest, which they claim is capital charges. Is that your understanding of why they're not pursuing a specific due process charge and instead just lumping it all under the Speedy Trial Act? I'm going to run out of time. May I have leave to finish this answer? Of course. You may answer the question. Yes, that is my understanding of their position. That position is inconsistent with the Supreme Court case law and this court's case law. In Marion, the Supreme Court talked about how the Speedy Trial right… You don't need to go into all this. I just want a confirmation because I'm going to want the Dependents' Council to respond. Absolutely, Judge. Thank you. You said time for rebuttal, counsel. I did. I believe I preserved five minutes for rebuttal. Okay. Mr. McBeth, you may proceed. Thank you, Your Honor, and good morning. My name is Colin McBeth and I represent DFLE, Lamar Rene Duran-Gomez. Your Honor, Mr. Duran-Gomez has waited… Before you start, I know you're an assistant federal public defender in Maryland and your federal public defender is also on the brief. When were you all brought into the case? I believe we were appointed at the very end of 2018, Your Honor. At the end of 2018? Correct. All right. Thank you. And, Your Honor, I'll just start, I guess, where you left off, Judge Barksdale, which is the question of pre-indictment delay. So our position is, well, the case law is clear that the Sixth Amendment Speedy Trial right attaches at the earlier of arrest or indictment, whichever comes first. And our position is, and the district court found, that notwithstanding that ICE purported to detain Mr. Duran-Gomez for civil immigration offenses, he was actually arrested on the instant charges in 2006. So there is no… I mean, the pre-indictment period here starts… That's your argument. That's not a matter of solid fact. That's just your position on it. That's our position and that's the findings… Do you urge a due process pre-indictment violation? Correct. We did not raise a Fifth Amendment indictment claim, Your Honor. Do you agree that you couldn't achieve, that you can't make out that one? I don't know, Your Honor. Honestly, we don't know the case law that well because we're not raising the issue and, you know, for purposes of this appeal, we're happy to concede that, you know, that claim is not… But we think the Sixth Amendment claim has merit and the district court made a factual finding that Mr. Duran-Gomez was arrested for the instant charges in November 2006. The district court seems to think that he was arrested for some immigration charges. There are no immigration charges in this file, are there, counsel? Well, so Mr. Duran-Gomez was not charged, meaning indicted, for immigration offenses until 2010. But if you look at a couple things, I think it's clear that what ICE was really doing when they arrested him was arresting him for criminal immigration offenses. So the investigation is a criminal homicide investigation. It's not a civil immigration investigation. Mr. Duran-Gomez comes to ICE's attention because they received a tip that he's been involved in beating two people to death. I don't see that that's reflected in INF's paperwork. I mean, I don't believe you cited to us the record of deportable inadmissible alien, which clearly says why he was held in an administrative proceeding because of these two prior things where he used a deadly weapon and raped a woman with a knife and then has another one with an issue with his girlfriend. There was also both of these which qualify crimes as moral interpretive that he's previously been convicted of. That's why he was detained by ICE according to their paperwork, right? Well, yes, Your Honor, but I think the key words there are according to their paperwork. We absolutely recognize that. Are you saying ICE is lying? Well, the ruse exception, which we talked about in our brief, recognize that... Don't you raise that for the first time on appeal? So we don't use... No, you raised the ruse exception for the first time on appeal. Yes, in the sense that we did not use the words ruse exception in district court, but we made an argument that is in substance the same argument. So in our reply to our motion to dismiss, we said that for all intents and purposes, for all practical purposes, Mr. Durangonis was arrested on the incident charges in 2006. And we supported that argument by pointing to the rationale that underlies the ruse exception, which is that if civil and criminal officials can't sort of put one thing down on a piece of paper while really holding something else, then the protections of the Sixth Amendment become essentially meaningless, that the government can evade them, you know, through paperwork. And the ruse exception, what you say, we didn't call it the ruse exception, although we do now, that purported exception was raised in your motion to dismiss in 2019. You're saying that was in your 2019 motion to dismiss? Well, it was at least in our reply to the government's argument. So I'm not sure whether we made that specific argument in the motion itself, but in the briefing— So you agree you didn't even make it in your motion, but you waited until your reply to make it? Well, I would have to check the motion, but I'm not sure. We certainly made the argument in our reply. We made the argument at the oral argument in front of the district court, and the district court credited that argument. And, you know, in this case, the ruse exception applied as long as the primary or exclusive basis of the detention was holding someone for future criminal charges. You know, we're not necessarily contending the exclusive reason for holding him was that he was facing criminal charges, but I think the circumstances surrounding his arrest make it very clear that at least the primary purpose for holding him was these murders. I mean, the whole investigation leading up to his arrest was a homicide investigation. They, you know, they began surveilling him two hours after learning of his tip about the murders. They searched the warehouse three hours after the arrest where they believed the murders took place. Following arrest, they Mirandized Mr. Duran-Gomez and asked him questions about the murders. It's, you know, for sure, they wrote down on the paperwork that he was being detained for civil immigration violations, but even in the paperwork on the day of arrest, there are indications that the murders are the real basis of his detention. I mean, we point to the CTAS report where it says the law charged against Mr. Duran-Gomez is 8 U.S.C. 1324, which is the alien harboring statute that he was eventually indicted for. That's just the property. That just keeps up the property. The actual document is what we've been discussing earlier, and that document says nothing about except that it was administrative and lists the prior offenses for which the administrative would apply. Is that correct? That is correct, Your Honor, but my point is that with the risk exception, you don't look just at what the sort of purported, Why is coward a big obstacle to you? How is the administrative immigration? You agree that these administrative immigration violations didn't take place, right? And how is that different than the defendant's parole violations in coward? So in coward, the court said that he was taking in on the parole violations and that there was no evidence. There was no evidence that he was actually being held in anticipation of charges being filed in a criminal case against him. That is not the case here. I think that the evidence here is strong that they were anticipating charges against him. And for all the reasons I've said, as well as the fact that, you know, they continued the investigation after he was arrested. And, you know, coward, I think you have to read in harmony with and can be read in harmony with the risk exception cases, which say that, you know, there can be a formal reason for arresting someone. And at the same time, it can be true that law enforcement officials or civil immigration officials, whoever, have additional reasons for holding someone. Are you saying that the ruse took place between November 21st and December 4th? Or are you saying the ruse took place after he was transferred into the custody? Did it only take place for two weeks, the ruse? Because he was then transferred pursuant to the other crime that he allegedly committed or actually was found guilty of committing. So, your Honor, our position is it began on November 21st, but he was taken into custody and it continued up until the indictment for the current charges. So, you're saying the whole other prosecution is a ruse? No, no, that is not our position, to be clear. He was in custody for that prosecution, except for the first two weeks. That's correct, Your Honor. But once... Go ahead. I'm sorry. Once the speedy trial right attaches, it remains attached. It doesn't detatch just because other charges have been brought. So, if at the time of the arrest, the ruse exception would say that he was arrested for the incident charges, then that remains true, notwithstanding that there are additional charges brought later. So, we're not saying the obstruction charge is a ruse or perpetual. We're simply saying that the speedy trial right adds to the incident offenses attached in 2006, and it remains attached once it attaches, and nothing caused it to detatch before indictment. Is Mr. Odom still a lawyer for your client? Yes, he is. Is he the lead counsel? Are you the lead counsel? Your co-counsel, the lead counsel? Mr. Odom and Mr. Davis, and then two attorneys from our office are also the co-lead counsel in this case. You're all four lead counsel. I think so, Your Honor. I'm not exactly sure, to be honest. Mr. Odom is not in this brief, on this brief. No, that's correct. He's not involved in the appeal. Mr. Odom didn't participate in this at all, and that's a question. Are you saying that Mr. Odom and Mr. Neal, who have practiced in Harris County and in federal court in Texas, don't know what an open file process is? Because that's the routine method in both Harris County and in this U.S. Attorney's Office. And they are both extremely, have been in this, this is not their first rodeo, so to speak. And I'm not trying to disparage, this is a very serious, serious prostitution offense. No, I understand, Your Honor. And I mean, the question is, what does open file policy mean? Right, and what do they understand it to mean? Because they're very experienced in this neck of the woods. Are you, do you say that they did not know what it was, or are you saying that you didn't know what it was? So, my understanding is they did not know what it was. But Wendell Odom, who prosecuted Andrea, I mean, who defended Andrea Yates, did not know what an open file policy was? That's your position, sir? Your Honor, that's my understanding. Their understanding, at least within the confines of this case, that when the U.S. Attorney's Office told them that an open file policy existed, that meant that the defense would ultimately have access to all information that the government had. But it did not mean that the defense was supposed to go to the U.S. Attorney's Office to obtain discovery. I think, you know... What do you base that on in the record, counsel? Several things, Your Honor. So, first, the first batch of discovery that was produced... No, what do you base on? We didn't understand when they said we have an open file policy, we didn't have to go to their office. Is that in the record? There's no statement where anyone said that. Right, thank you. Now, I find it interesting that you and Mr. Wida, federal public defender in Maryland, were brought in at the end of 2018, and slam-bam, a motion to dismiss was filed in May after nothing of that sort had been sought in this case until then. Is there anything in the record?  Is there anything in the record as to this being urged by the two new lawyers from Maryland? In the record? Not that I'm aware of, Your Honor. How do you explain that in July of 2019, you're seeking a trial in March... I'm sorry, in May of 2019, you're suggesting a January 2022 trial, and then in August of 2019, you move to dismiss charges. Well, I don't think those two things are... Is there anything in the record on that? On why the... Yes, sir, why, and of course, y'all are brand new, relatively speaking, to this case, yet Durand suggests a January 2022 trial on 8 May 2019. The U.S. counters with 2021. On 30 July, the court adopts a joint scheduling proposal and sets trial for March 8, 2021, and then less than a month later, 26 August, Durand moves to dismiss the charges. It just seems very coincidental that this is all after counsel from Maryland is brought in at the end of 2018. And, Your Honor, I don't know. There's nothing in the record about, you know, exactly why Strango missed work at that time, and I don't know. All right. That's the only... This is sort of, in a way, a microcosm of the way this whole case is preceded. The government claimed that after the status conference on May 8, 2019, it requested a transcript of the conference, and it's still awaiting it. That's what it claims at Note 7 at 62 in its blue brief. Y'all counter in your red brief, 46 Note 3, that the transcript has been provided. Is there any basis, anything in the record as to why it took so long to get a simple transcript of the schedule? No. I'm sorry, Your Honor? Can you answer that question again? I was frozen. No, there's nothing in the record to explain why it took so long to get a transcript. Both parties ordered, my understanding is both parties ordered the transcript, you know, several months before the briefs were filed, and I don't know what the explanation is. And just to be clear, we, in our initial brief that we filed, we still had not received the transcript at that point. When we then received it after filing the brief and in our amended brief that we submitted, we at that point noted that we had received the transcript. Well, it just seems, as I say, to be a microcosm of the way this whole trial, the whole case has proceeded. But I'll move on. Are you in a chew? Is that what's your normal? No, Your Honor, we don't have any habeas in our office. It's just a trial office. I'm just trying to figure out what precipitated. They had two lawyers already. Yes. We weren't aware. We don't have that information before us. And honestly, Your Honor, I don't really know exactly what the backstory is either. I know a motion was made, but I couldn't tell you how or why that motion got made. If I could just for a second go back. I'll go back to one of the statements that your opposing counsel made early on. He gave a count of the number of times you all sought a continuance as well as the number of times somebody else sought a continuance, either the government or a co-defendant, and you all agreed. Do you agree with this count? Yes, Your Honor. We agree that the continuances were made or agreed to. Our position, though, is that the analysis of the second Barker factor can't just be a question of did you agree to a continuance or not, but under what circumstances and why did you move forward or agree to a continuance? I'm sorry, go ahead. I'm sorry, Your Honor. I mean, in this case, the government chose to indict all six co-defendants in a single indictment, notwithstanding that two of them were at large. And then chose to make no efforts to track down Skarza or Rodriguez-Skarza, only arrested them because they, by happenstance… What is your basis in the record for saying they made no effort? Well, in fact, there is nothing in the record to suggest they did other than putting out a warrant, which is, you know, that is what the government did in this object case. What else would there be? They put out a warrant for them, and then they, fortunately, come back into the country and they're arrested. Sure, Your Honor, but the case law is that the government has to exercise reasonable diligence in arresting… I'm saying, what is any evidence that they didn't exercise reasonable diligence? Are they supposed to file some sort of weekly status report of efforts made to arrest them? No, there's no requirement like that, but I think if the government had made reasonable diligent efforts to seek these defendants, you know, they would either have introduced it or at least proffered that they had made such efforts. I mean, the government, even in its reply brief in this court, does not seem to dispute that it did not make any efforts beyond, you know, filing a warrant in the database, which courts have said is not safe. I'm sorry, Judge Ho. No, no, finish your point, and then I'll ask a question. Just the last point on that is that the government says in its reply brief that the duty to use reasonable diligence to arrest defendants does not apply to co-defendants. It only applies to the defendant himself, but in the Bergfeld case in this court, the court held that the government's failure to use reasonable diligence to apprehend a co-defendant weighed against the government as to a different defendant in the speedy trial analysis, which makes sense. I mean, if the government indicts people together and they remain together throughout the case, then any time that, you know, one defendant's case is prolonged, it's going to affect the other defendant. Mr. McBeth, the opposing counsel says there's no evidence in the record that a counsel from your client ever requested a speedy trial. Is that true? So there's no evidence that he ever filed a motion or said on the record that he demanded a speedy trial. That is certainly true. We don't deny that. But, you know, the standard. Is there any reason, by the count, I think it was well over a dozen times where you either asked for a continuance or you agreed to somebody else's continuance on some of those occasions explicitly saying that fairness to your client would require a delay? So my question is, is there a reason why at any of those moments you could not have moved to dismiss on a speedy trial violation? Obviously, dismissal will be a total victory. Why not ask? Your Honor, I don't know. I realize this was before you were involved, but you can understand why we're asking this question. It's troubling to wait this long. And then all of a sudden to get this request when you, by all accounts, could have made this request. And in fact, the opposite over a dozen times. We certainly could have made the request sooner, Your Honor. Of course, you know, I don't think that the fact that we failed to move to dismiss earlier, you know, should weigh against the defendant. But the question of the third cycle of the Barker analysis is simply whether you assert the right or not. And, you know, as I said in the response to Judge Elrod, we recognize there was never a time when we said on the record, you know, our Sixth Amendment speedy trial right is being violated if we want a speedy trial. But the standard, you know, does not require something that specific. Just talk practically for a second. Is there a practical reason that we need to be aware of that you could not have made this argument, that it would have been detrimental to your client, it would have been a bad strategy? At least, you know, give me a story as to why this was not a good idea to ask for it earlier, even though you wanted it. To be honest, Your Honor, I don't know. I mean, I think the longer the delay goes on, obviously, the stronger the argument is. I mean, because even at the end, you were still wanting more time than the government wanted. Well, so we were we were trying to operate on two tracks, which is one to make a motion. But in the event the motion fails, be prepared for trial. I mean, I think we have to do both. And I get that. You know, your view is, well, you know, you heard us on the discovery, et cetera, et cetera. I guess my point, though, is you could be making these arguments earlier. I mean, I assume you agree a speedy trial violation is, as you got here, a total dismissal, a total win. Why didn't you want a total win on any of more than a dozen occasions? I mean, we probably did. Your Honor, I don't know. I don't know the reason that the motion wasn't filed earlier. I'm not trying to duck the question. I just don't know the answer to it. That's a fair response. Mr. Macbeth, name me the lead counsel at the time the motion to dismiss was filed. It apparently was your boss, Mr. Wida. Is he lead counsel? Your Honor, I'm not sure there's one person who is lead counsel in this case. I don't know. I mean, it's really, you know, we have four lawyers, Mr. Wida, Ms. Belzig, Mr. Davis, Mr. Odom, who are the trial attorneys. And there isn't, you know, as far as I know, a real hierarchy among them. I don't know the answer to that, Your Honor. If I could just go back to the discovery for a moment on this question of what open file policy means. So, as I said earlier, there's no point in the record where the defense counsel says we don't realize what open file policy means. We have to go to the U.S. attorney's office. But if you look at the course of interaction between the two sides, I think it's clear that the understanding was that when the government had discovery that it was available for the defense, they would let the defense know that so that they could either pick it up or it could be transmitted to them. And that's based on first the electronic transmission in November 2010, and then the e-mails that the U.S. attorney's office sent to defense counsel in April of 2011 and January of 2012 saying more discovery is available, you can come and pick it up. And then, you know, in addition, at the status conference in March of 2017, which was two months after the discovery dump, the district court asked the government, why are you only now dumping all these new documents on the defense? And, you know, if the answer had been, if the truthful answer had been, well, the defense knew all along that they could have come and picked these documents up, then surely that would have been the first thing the government said. And that would have diffused, and that would have answered the question entirely, and there would be no issue to talk about. But the government didn't say that. And similarly, in our motion to dismiss, we say that part of the reason this case went on for so long is that the government produced all this new discovery in 2017. In its motion, in its response to our motion to dismiss, government did not dispute that, and it didn't say anything about an open file policy. It did not say the reason we're only producing it now is that it's been available all along, which, again, if that were, you know, if that were really the true understanding between the parties, that would be the first thing the government would say, because that's the total answer to that charge. And the government didn't say it. Relatedly, when we filed, when we sent the government discovery requests in April, June, and July of 2019, the government produced a partial production in May that there was nothing in their responses to say, well, the rest of it is available at the U.S. Attorney's Office, come pick it up then. What is the date of the first correspondence or communication from the U.S. Attorney's Office to Duran's counsel, Ray, the open file policy? So I don't think in the record there's any correspondence about that. The first time it's, the words open file policy are mentioned in the record are at, I think it's the status conference in 2012. I can't remember the month, but there was a status conference in 2012 at which the government used the words open file policy, and that was the first time those words showed up. And, you know, the words open file policy appeared in the pleadings for the first time in our reply to the motion to dismiss, where we said the government pledged to have an open file policy, but has not done so. And then two months later, and they- But once again, that gets into the debate of who has the burden once the government says we have an open file. I can picture an open file sitting on a table just waiting for you to come look through it. Well, it could mean that, Your Honor. We're not saying that it could mean that, but the question in this case is what did it mean to these parties? And I, what I'm trying to say is that I think the course of the interaction with emails from the U.S. Attorney's Office- I mean, open file is open file, and anybody that's been practicing criminal law maybe 25 minutes understands that. We don't take judicial notice of that. Respectfully, Your Honor, I disagree. I mean, I think- You've never heard of open file before you came to Houston? Yes, I have, but I think it can have a number of meanings, and in fact- A different meaning of open file than the file is here, come look through it. It's your pleasure. It can mean that whatever information the government has will be made available. This court's cases, I think, make that point. So, two points on that. The first is that the Supreme Court has said, and I'm quoting now from the Strickler v. Green case, quote, the precise dimensions of an open file policy may vary from jurisdiction to jurisdiction. What's your definition of open file that you worry counsel had earlier, and what's your best authority to support that definition? Our understanding of the term is that it means the government has pledged that all information that it has access to relating to the case will be provided to the defense, and that when those documents are ready to be produced, the government will inform defense counsel of that fact so that either they can be- So, don't call us, we'll call you, is your understanding? Yes. Okay. What's your best authority for that definition? So, I don't have a case that specifically talks about it in that context, but I- Or a U.S. attorney manual or just something. Who has that definition of open file? Because I will confess, I share Judge Barksdale's theory that open file is a pretty straightforward term, but teach me. If there's another definition of that term in the criminal defense bar, I want to hear about it. Well, I don't have a U.S. attorney's manual citation, but if you look at this court's opinion in the United States case of Skilling, which is the Enron appeal, in that case, the discovery was many millions of pages, and the defendant made a Brady claim that the government had essentially violated Brady by producing a huge document dump and burying Brady in that discovery. And this court rejected that claim based on the fact that the government had an open file policy. But in the course of discussing that policy, it talks about it in ways that I think made clear that the defendant was not supposed to go to the U.S. attorney's office to find the discovery. Instead, it was being sent to the defendant. So, for instance- Well, that points directly to the question I was going to ask you, why you didn't bring a Brady claim. During this litigation since 2010, or in your view, 2006, no Brady claim was filed, was it? No, Your Honor. I mean, when this discovery dump took place, we were still a ways out from trial. You know, discovery dump is a very pejorative term, but you keep using it if you want to. They had provided you with 10,000 documents. Then, out of abundance of caution, they gave you 55,000 plus the 10 they had previously given you. So, Your Honor, we did not raise a Brady issue because, as the government points out in its discovery, Brady requires an assessment of materiality, which has to be judged on the basis of the evidence at trial. So, when we received these documents, the trial was still a ways off. We had access to the material then. They were received on 31 January 2017, which is a year before you and Mr. Wyda came in from Maryland to Houston to save the day. So, I don't know how you can say what the thinking was before you came into this case. I don't know, Your Honor, but I'm saying I don't think a Brady motion would have gone anywhere if they had filed one at that point because, again, Brady depends on materiality. Brady requires that you not have access to the evidence produced at trial. At that point, once the evidence had been produced, you did have access. It's quite interesting that you're arguing this case having been a newcomer to it instead of someone who worked on the case since 2006 or 2010, such as Mr. Odom. But that's for us to think about. You don't need to answer that. Thank you, Your Honor, and I see none of the time. I do have a question, and I'll let you give your last sentence or whatever to wrap up, but I have a question before we do that. Normally, when we have one of these cases, we go through and we segregate out the amount of time. We're trying to figure out what was the delay. We segregate the amount of time where the criminal defendant is asking for more time, and that doesn't count against the deadlines. We usually use when is the time that the delay is all on the government or all on the court, and it's not at all on the defendant. It's really hard to do that in this case because Nod didn't oppose in November 2010, moved to continue in March of 2011, unopposed on another continuance in March of 2011, moved to continue, and unopposed on November of 2011. Every single, like every three months or so, it appears that your client is either joining or moving for some sort of continuance. So what is the period of time? Are you saying since the arrest in 2006 is the amount of time? What is the realistic period of time where your client is not the one asking for a continuance, and the delay is really on somebody else using our case law that normally parses it like that? So, Your Honor, to start, I agree with you that it's a little difficult to parse out in this case, especially the last year or two before the dismissal, it gets messy. But I think there's two lines in the sand I would draw. The first is to put on an effective defense in a capital case, we have to do a thorough mitigation investigation of the client's background. We started submitting requests for funding for that shortly after the death notice was determined, and did not receive even what we think was the bare minimum necessary to do that until the beginning of January 2018. And of course, once we have the money, it then takes time to use it to actually conduct the investigation. So if we had proceeded to trial before the funding was available for mitigation, that would have been close to per se ineffective. That is part of the standard of care in a capital federal case. In your funding request, did you state to our court, or to the district court, and then to our court, I suppose, we have to have this money ASAP because this is a death case and things are really dragging in this matter? So, we did in the one emergency motion that was filed in district court. Which was, I believe, in the date of the emergency motion. I believe that was May of 2013 that we filed the emergency motion. The others do not express the urgency in the same terms. They certainly request the money, and we did follow up several times with the district court filing status reports saying, you know, we're waiting for the money so we can travel to El Salvador to conduct this investigation. There was an appointment, the council emailed the district court's chambers and asked for clarification, a sort of gentle prod to follow up on this. We made, I think, reasonably diligent efforts to obtain the money. So, the delay was caused by Judge Hoyt and then by our court? Well, Your Honor, the Barker analysis recognizes that institutional delays, which can include things like overcrowded dockets, and in the Vermont v. Breon case, it was money for public defenders. Those count against the government, even if the individual prosecutors in the case are not responsible for that. This court recognized that in the Boyer v. Benoit case where the Louisiana appellate court said the delay is due to lack of funding for a defense counsel, and therefore we can't weigh it against the government. Go ahead. No, just the final point is this court said no, even though it is not the prosecutor's fault, it still weighs against the government because under the Vermont v. Breon line of cases, institutional reasons weigh against government. Okay, I still don't have my answer as to what time period is on someone else other than your client. It's clearly on someone else other than your client. You started telling me about a circumstance, which is not the circumstance the district court used in its analysis, in its opinion at all. So, can you tell me what the time period, from this date to this date, it's on somebody else other than us? Sure. So, Your Honor, so our position is from the date of indictment until the government decided that it would seek the death penalty against Mr. Rodriguez Mendoza, that period of delay weighs against the government. And the reason is this, that the government chose to indict all defendants in a single indictment, even though two of them were at large at the time. And then after, you know, once the case was progressing and Mr. Rodriguez Mendoza had been arrested, government made clear that it would not agree to a severance. And in any event, even if we had filed a speeding trial-based severance, that motion would have been legally meritless under this court's opinion in Posada-Rios, which says that speeding trial concerns are not a basis for a severance motion. So, the government keeps saying in its brief, and again, to their oral argument, that we made a choice to wait for the outcome of Mr. Rodriguez Mendoza's case, but there wasn't a choice. We can't, when the government indicts people together, and we're unable to move for severance based on delay, we don't have a choice. The government is the one that can choose either to try people together or separately or what the timeline is. So, it's July 1st, 2010 to February 10th, 2017. You say it's on someone else that whole time. Correct. Is that the answer to my question? I've gone through the chart and tried to figure out the date. Yes, Your Honor, that is the answer, and I of course acknowledge that we were during that time bringing continuances and moving for continuances. But the point is that, you know, there was, as I said, for reasons I just said, no real alternative to that. Okay, I don't understand your point that you were just making about severance. I know we need to wrap it up, and I'm going to give you five extra minutes because we've taken much more than that with opposing counsel. Sure. So, Your Honor, I apologize. The government has said that we made a strategic choice to await the outcome of Mr. Rodriguez Mendoza's death authorization process, and that we could have chosen to go to trial without waiting for that. And, you know, I don't know what that means, but I think what the government is saying is that, you know, if we were concerned about the delay, we could have moved for severance on that basis and therefore gone to trial before Mr. Rodriguez Mendoza. You could have asked for a separate trial, and the judge seemed to be somewhat amenable to the idea several times. He was, Your Honor. But the point is that, you know, under this court's case law, speedy trial concerns are not a basis for severance. And that's what the court held in the Posada-Rios case, which we cite in our brief, where the defendant was part of a 35-defendant indictment. And he moved for severance based, at least in part, on his speedy trial concern and was denied. And then on appeal, this court said that that is not the kind of concern, that's not the kind of basis that can support a severance motion. That kind of seems like it would be helpful if you moved and lost. But that doesn't say you shouldn't move for severance. If you want to be severed from somebody because you don't know if they're going to be death eligible. Your Honor, I think if the law says that the motion has no legal support, I don't think you can hold the failure to file the motion against someone if it's a loser. I thought you were going to be filing the motion because you didn't know whether he was up for the death penalty. That's a different ground than was in the Posada case. It is, but I think my point is, I think what the government is saying is that we chose to move for continuance because we could have instead moved to sever the case based on delay. And if that's what the government is saying, which I think is what they're saying, my response is we couldn't have moved based on delay because the Posada-Rios case says that's not a basis for severance. Do you understand the government announced that it was pursuing the death penalty against your client as of October 2012? Correct. Okay. Is it fair to assume that most defendants faced with a death sentence prefer delay? I don't know, Your Honor. I mean, I think certainly... Would you agree that many people on death row hope to delay their death sentence as long as possible? Yes, Your Honor, but those people have already been found guilty and are facing a death sentence. That's not true of someone who hasn't gone to trial yet. And I'm not suggesting people facing a death sentence don't have a right to speedy trial. Of course they do. The point is you can understand why somebody in that situation, like your client, would not insist on a speedy trial or at least wait until 2019 to ask for one. Yeah, that might be true, Your Honor. And the Barker case itself says that sometimes delay is to the defendant's benefit. We're not denying that. But I'm saying I don't think you can assume that delay is to the defendant's benefit. I'm not assuming. It's just it is interesting to hear all these arguments made now and not at any point during these previous however many years since 2012. As you can tell, that's what's troubling me. Understood, Your Honor. And, you know, to try to address that, certainly the assertion... I mean, as the government pointed out a minute ago, the Frye case says that moving to dismiss is not itself an assertion of the right. That's the law. So I don't think the failure to move to dismiss earlier is an indication that you are misserving the right. What's indicative of whether he asserted or not is whether he said, I want speedy trial, but not whether he moved to dismiss on that case. And I do think Frye draws a distinction between those two things. But he didn't really do that either. Well, he did not move to dismiss until... It's not a magic words test. It's that he's not doing anything in form or substance. Well, so as I said, he certainly did not say, my Fifth Amendment right has been violated. I want to go to trial quickly. There were, I think, several points which he at least indicated, or to use Frye's language, manifested a desire to be tried promptly, including the request to the district court to set a deadline for the death authorization process. Now, of course, that motion, I recognize, does not say we are asking you to do this because of speedy trial concerns. But I think the import of that motion was that unless the deadline is set promptly, we will have to move for further continuances, and we'd rather not do that. And therefore, it is at least... It's not a speedy charge decision. It's not a speedy trial request. Well, but what I'm trying to say is the reason we needed to know the outcome of that death authorization process sooner rather than later is that if it came later, we would then have to move for another continuance. And so the reason to ask for a deadline is to avoid having to ask for a new continuance. In other words, we would like this to be over sooner rather than later. Is there something in the record that says that your client's number one goal, at least early on, was to not go back to El Salvador? I think maybe, Your Honor, you may be referring to the notes from the proffer, is that what you're thinking of, where he told the U.S. attorney that he... Yes, I think he said his number one goal was to avoid being sent back to El Salvador. I think that's correct. Okay, and where is he detained now? He has been either at the Joe Corley Detention Center or at another facility outside Houston. I'm not exactly sure which one was that, but it's been back and forth between those two. So he's detained there pursuant to the outcome of our appeal. Is that correct? Correct, Your Honor. And then if you were to be successful, and I'm not foreshadowing, I'm just giving the possibility, if you were to be successful, then he would no longer be in federal, that type of custody. He would be, go to immigration custody at that time. Is that correct? That's my understanding, Your Honor, yes. If you're not successful, then he'll stay there or be moved pending trial. Correct, Your Honor. Okay. Did you say your last wrap-up sentence? No, that's fine, Your Honor. That's all I have unless the court has more questions. Okay, thank you. Mr. Smith. Yes, Your Honor. Thank you. Briefly, I just want to address the severance question. The question of whether a severance motion would be legally valid or not is a little bit beside the point. What this court has to assess is, did Mr. Durand-Gomez actually want a prompt trial? And he could have asserted that by moving for a severance. Maybe that motion would have prevailed, maybe it wouldn't. But the fact that it might, even assuming for the sake of argument here that it's a legal long shot, Mr. Durand-Gomez has made a lot of legal long shot arguments, right? He moved to dismiss on speedy trial grounds, having never over more than a decade sought a speedy trial. He sought to have the death penalty struck on speedy trial grounds when the Supreme Court has said the only remedy for a speedy trial violation is dismissal of the indictment. So looking at the fact that he never moved for a severance is positive. Suing the co-defendant here. I'm afraid we may have missed the last 20 seconds of your statement. Gosh, and I don't know when that was. The failure to move for severance. Even if he had moved. I think it was even if he had moved for a severance. Right. So the severance question is really probative of, if not dispositive of whether Mr. Durand-Gomez actually wanted a speedy trial. And the fact that he never moved for a severance shows that he never did want a speedy trial. Mr. McBeth had focused a bit on what evidence there is or isn't in the record in terms of the government diligently pursuing the co-defendants. I want to make a couple of points on that. Number one, that stems from the defense's attempt to impose on the government a duty to be seeking co-defendants diligently with respect to Mr. Durand-Gomez's speedy trial rights. And none of the case law extends that far, particularly in a case like this where the government never delayed trying Durand-Gomez while trying to track down the co-defendants. Here, the government was moving apace with the prosecution of Mr. Durand-Gomez when the co-defendants were arrested. This wasn't the only delay related to those arrests. Number one comes after the arrests themselves. And number two, at the request of Mr. Durand-Gomez, because he wants to know what's going on with his co-defendants before preparing for trial. And again, that's a strategic choice he can make, but there's a tradeoff there. It's like a defendant's strategic choice to testify or not testify. You can exercise your right to testify. You can exercise your right not to testify. They both have pluses and minuses. That's the same kind of balance that's going on here. The question about whether the defendants were charged in the same indictment, I think it's a bit of a red herring. Even if the government had charged Durand-Gomez, Rodriguez-Mendoza, and Bolanos-Garza in three separate indictments, it is a safe bet that if those other two men, those other two co-conspirators had been arrested, and even in the context of a separate trial were going through the seek or no-seek process, Mr. Durand-Gomez likely still would have wanted to know whether they were going to be testifying in his case, whether they were going to be facing the death penalty in their cases if they're prosecuting in a separate trial because it's the same crux of fact. Counsel, what do you do with the fact that the opposing counsel says seven years, not quite seven years, but six and a half years of this is really on the court? I don't think that can be squared with the record, Your Honor. In terms of your questions about how do we carve out the time that isn't attributable to requests that Durand-Gomez either made or agreed to, there is no time since the indictment in this case that isn't covered by either his continuance request or a request that he joined in from someone else. The delay that might be attributable to the funding issues that he has complained about at this point is rather speculative. He, in requesting mitigation funding, as I understand the briefing, I think it was around pages 114 to 116 of their brief, they initially requested about $130,000 in funding with $110,000 being their bare minimum, and they ultimately obtained $114,000. Can I finish? I see my time has run out there. Saying that somehow that $17,000 difference caused enough delay here and enough prejudice to warrant dismissal at this point is at best, I think, speculative and really hard to support on the record here when the record shows that there were innumerable other reasons why Mr. Durand-Gomez wanted to delay. He wanted to seek the opportunity to plead guilty. He wanted the opportunity to litigate additional motions, all of which are lost if he rushes to trial and is in a situation of having likely been convicted and facing a capital sentence. Mr. Smith, Judge Elrod gave you five extra minutes. I found it interesting that counsel for defendant stated the delay attributable to the government starts in February 2010 and didn't mention the period of November 06 up to February 2010, which they claim he was arrested on capital charges back in 06. Do you have any understanding of why he might be deleting that period, the pre-indictment period? I don't, Your Honor. I assume it was just a bit of a misstatement in the haste of argument. My understanding is that they are looking to have the speedy trial right attach in 2006 contrary to this court's case law, contrary to Supreme Court case law, and leads to this absurd situation where a defendant has a right to a speedy trial on charges that won't be brought for years to come. Any charge that might arise from the investigation that's going on during that time period, as we point out in our brief, if that's a Vicar charge, a 924C charge, under their theory of when the speedy trial right attaches, Mr. Grand Gomez has a speedy trial right to those charges right now, even though he's never been charged with those crimes. I assume that the oversight at oral argument is either just an oversight or maybe it's abandoning the position because it is untenable. If the court doesn't have any further questions or rests on our briefs, we ask that this court reverse the district court's dismissal order, reverse its findings that the government acted in bad faith, and remand this case for trial. Thank you. Thank you, counsel. We appreciate both counsel appearing in this format for argument. I know it's not perfect, but it's the best we can do right now. Thank you for being prepared, both counsel. This case is hereby submitted. Thank you.